KNICKERBOCKER TRUST CO. v. EVANS.

(Circuit Court of Appeals, First Circuit.  May 19, 1911.)

Nos. 888-893.

1. CORPORATIONS (§ 77*) — CONSTRUCTION OF SUBSCRIPTION — PRINCIPAL OR GUARANTOR.

To enable a silk company to take over certain other corporations and properties, a syndicate was formed to which the promoter and defendants were parties.  Syndicate managers were appointed, and an underwriting agreement entered into, by which each of defendants agreed to pay a certain sum, for which he was to receive common and preferred stock from a new issue aggregating a larger amount at par value.  The amount was to be paid in part in cash, a further amount on call of the managers, and payment of the remainder, with interest at 6 per cent., was to be deferred for one year or more.  To raise the cash necessary to purchase the properties, it was provided that the managers and the promoter might borrow money and pledge the subscriptions and stock as collateral security therefor, provided that the loan should be for one year or more and the interest with which the subscribers should be chargeable should not exceed 6 per cent. per annum.  The agreement further provided that "in the event that any such loan is made each of the subscribers whose subscription is pledged as security therefor, for himself only and not for any or either of the others hereby guarantees to the lender * * * the payment of such proportion of the principal and interest of said loan as the unpaid part of his subscription hereto shall bear to the aggregate amount remaining due upon all of the subscriptions pledged; * * * and each of the subscribers hereby agrees that the lender shall have the right to proceed against the subscribers severally at once upon default to recover the several sums hereby guaranteed as aforesaid * * * without recourse to any other party and without recourse to any collateral security being first had or required."  On the faith of such agreement, plaintiff lent a sum in excess of $800,000, taking the note of the promoter and the underwriting agreement and certificates for the stock called for thereby as security.  The note was for one year, but called for 6 per cent. interest payable semiannually, and provided that it should become due and payable at once in case the maker became bankrupt or made an assignment.  *Held* that, notwithstanding the use of the term "guarantee" in the agreement, the subscribers were in a substantial sense the principals, for whose purposes the loan was made, and not guarantors, the syndicate managers and the promoters being their agents to procure it; that the rights of plaintiff against them were not based on the note, but were measured by the agreement, of whose terms plaintiff was fully advised, and its right to recover against them thereon was not, therefore, affected by the fact that there was some variance between the terms of the note and the agreement with respect to the rate of interest and for the maturity of the note in certain events before the expiration of a year; and that, defendants' obligation

being primary and not that of sureties or guarantors, no notice by plaintiff to them of the loan contract was necessary to bind them.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 210–212, 219–243; Dec. Dig. § 77.*]

2. APPEAL AND ERROR (§ 1053*)—ADMISSION OF IMMATERIAL EVIDENCE—EFFECT OF WITHDRAWAL.

The repeated admission, throughout a long trial, of evidence offered by the defendant tending to establish a conspiracy to which plaintiff was a party as alleged in the answer, although such issue had been previously eliminated from the case by the action taken on one count of the declaration, was error of so prejudicial a character that it was not cured by the withdrawal of such evidence from the jury at the close of the trial.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4178–4184; Dec. Dig. § 1053.*]

In Error to the Circuit Court of the United States for the District of Massachusetts.

Actions at law by the Knickerbocker Trust Company against Maria A. Evans, executrix, against Stephen M. Weld, against Theophilus Parsons, against Albert S. Bigelow, against William M. Conant, and against Russell S. Codman. Judgment for defendant in each case, and plaintiff brings error. Reversed.

John G. Milburn and Julien T. Davies (Julien T. Davies, Jr., Harold McCollom, Davies, Stone & Auerbach, and Gaston, Snow & Saltonstall, on the brief), for plaintiff in error.

Felix Rackemann and H. E. Bolles (George L. Huntress, C. A. Tyler, O. D. Young, and Samuel C. Bennett, on the brief), for defendants in error.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

ALDRICH, District Judge. Here are six writs of error to review six judgments of the Circuit Court for the District of Massachusetts. The six cases were tried by jury, practically as one case, under the direction or order of the Circuit Court to that end. This course was adopted by the court on its own motion; but no question is raised against the validity or propriety of such trial. The issues are the same in all the cases, and the same considerations and principles apply to them all. The cases were argued together in this court as one case, and will be dealt with accordingly; and it is understood that consideration given to the questions involved, and the result reached as well, apply to each of the particular cases.

[1] The questions involved concern a situation in which the defendants became subscribers for certain shares of preferred and common stock in the American Silk Company, which was about to increase its capital stock and to take over certain other corporations and properties. In order to launch and carry through the business proposition, it was necessary to raise money with which to pay for the properties to be acquired and turned into the American Silk Company; and the necessary working cash capital was sought to be obtained through marketing for cash enough of the preferred and common stock to pay

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for the properties which were to become assets of the enlarged silk company.

To advance the enterprise, there was created what is called an "underwriting agreement," which undertook to set out the purposes of the parties interested in the general enterprise, and to establish certain rights and limitations in respect to the interests of the parties concerned. The underwriting agreement contemplated and provided for syndicate managers as a necessary and important working instrumentality. The promoters, the Bennett Company, the subscribers, and the syndicate managers, so called, were parties to the agreement.

It will become important to inquire whether the relations of the stock subscribers to the general enterprise were such as to make them principals, and thus bring them within the rules of law which govern primary obligations, or whether their relations were those of guarantors with collateral and secondary liability; in other words, whether their contracts or agreements, to which we have alluded in a general way, had reference to what was in substance their own indebtedness, or original undertakings, or to a situation in which their agreements made them simply guarantors of the indebtedness of others.

Under the view which will be stated more fully later on, we look upon the solution of this question as in effect controlling; and this is so because, if the subscribers were guarantors merely, with only secondary liability in respect to the obligations of others, they are entitled, at least on certain phases of the questions, to invoke the rules strictissimi juris; while, if they were in substance and effect principals, and their obligations primary, their rights would be ascertained and established on less technical rules and considerations.

The first count of the amended declarations proceeded upon the idea of direct liability of the subscriber created by the underwriting agreement in favor of whoever should make the contemplated loan.

The second count of the amended declarations was upon an assignment to the lender of the rights created in behalf of the Bennett Company by the underwriting agreement.

The loan contemplated by the enterprise at its inception and provided for by the underwriting agreement, and which as claimed amounted to a sum in the neighborhood of $850,000, was made by the Knickerbocker Trust Company, the plaintiff.

As the trial upon the first count terminated, there remained no question of fraud or bad faith on the part of the trust company which loaned the money; indeed, good faith was conceded, so far as concerned the trial upon the first count. There was, therefore, as a result of this, no question of fraud to be submitted to the jury under the first count, because the alleged fraud of the Bennett Company was inadmissible as a defense against the theory of direct liability from the subscribers to the trust company, acting in good faith.

At the conclusion of the plaintiff's case, or soon after, the court directed a verdict for the defendants on the first count, upon the ground that the loan was not such a loan as the defendants had agreed to guarantee. We understand the order directing the verdict was because of a supposed variance between the agreement of the sub-

scribers and the proofs in respect to the terms of the loan as disclosed by the loan agreement and the note; and it would seem from the record that, upon the question of variance, the court considered the agreement simply a guaranty, or "a conditional agreement to pay somebody else's debt."

The supposed variance upon which the defendants rely is based upon certain provisions in the agreement which are urged as safeguards inserted for the protection of the subscribers with respect to the contemplated time loan.

The agreement provided for the payment of 5 per cent. of the par value of the preferred stock at the time the agreement was executed, and 15 per cent. on call of the syndicate managers on five days' notice. It also provided that:

"Payment of the remainder with interest at 6 per cent. shall be deferred for one year or more from the date fixed for the payment of the 15 per cent. installment."

Again, and what is perhaps more pertinent, the following:

"Provided that each such loan shall be for the period of one year or more, and provided the interest with which the subscribers are chargeable shall not exceed the rate of 6 per cent. per annum."

A note dated April 11, 1907, for $843,050, signed by the Bennett Company, and payable to the Knickerbocker Trust Company, with interest at the rate of 6 per cent. per annum, payable semiannually, which referred to certificates of preferred stock, amounting to $1,211,500 par value, and common stock, amounting to $605,800 par value, and the underwriting agreement, which were deposited as collateral security, was introduced in evidence in connection with the transactions in question. The note in terms was expressly made payable "one year after date," but it contains the following provision:

"In case the undersigned shall be adjudged a bankrupt, or shall file a voluntary petition in bankruptcy, or shall make a general assignment for the benefit of creditors, this note shall become forthwith due and payable."

The supposed variance is based upon the idea that interest, being payable semiannually, offends that part of the agreement which provides that interest shall not exceed the rate of 6 per cent. per annum; that the deduction of a commission upon the loan puts the amount actually received by the syndicate managers and the Bennett Company at variance with the amount of the note; the more substantial contention being that the note, though on one year's time, was at variance with the agreement of the subscribers, because, in a certain contingency, that of bankruptcy or general assignment, it might "become forthwith due and payable."

Apparently the learned judge at the trial looked at the question of variance as one not founded upon substance, but as one involving a technical departure, not to be looked upon with favor, because, as appears by the record, he characterized the point as one based upon "a very small hole," and, further remarking in respect to it, said:

"Therefore, without making the slightest reflection on any defendant, I say that, so far as this particular point is concerned, I have labored hard to see if I could reach a decision favorable to the plaintiff, because, so far as the case is now presented to me, the justice of the case is with the plaintiff."

Seemingly the question of variance was dealt with and disposed of upon such considerations and upon such strict rules as would doubtless properly apply to situations which involve the strict and ordinary relations of guarantor or surety to the obligations of another. If the defendants sustained the relationship of guarantors in the sense in which that legal obligation is ordinarily accepted, the variance, although technical, and one more of the letter than of the substance of the agreement, would perhaps be fatal to the trust company's right of recovery. It is true that the terms "guaranty" or "guarantees" were used in the provision of the agreement in respect to the obligations of the stock subscribers; and it is quite natural, in a jury trial, where questions of law are imperfectly presented, that it should have been accepted as properly describing their relations to the transactions involved; but upon a more complete presentation through the formal and elaborate arguments of counsel before us we are persuaded that, in substance and effect, the relationship of the subscribers to the enterprise was not at all that of either sureties or guarantors, because, aside from the fact that the Bennett Company was more actively promoting an enlargement of the American Silk Company through bringing about an increase of its capital stock and the taking over of outside properties, the subscribers were equally principals, or originals, in the joint enterprise of securing a certain business result. The very object of securing the advance subscription was to so far capitalize the enterprise, at its inception, as to make it feasible; and, by joining in the general scheme for the purpose of giving it financial aid and of making it successful, and for the purpose of securing certain ground-floor advantages, not using the expression offensively, the stock subscribers became principals in every substantial sense of becoming an original part of the enterprise. Without characterizing the enterprise as involving unwarrantable methods, by furnishing the necessary sinews the subscribers were securing to themselves certain pecuniary advantages, because, by thus joining in the enterprise and giving it aid, they became entitled to the profits on the stock of the silk company which would result through the increase of stock and the acquisition of new properties, and which would give them $150 in fully paid stock for each $90 actually paid in.

The exact status of the rights of the subscribers, in respect to the benefits which they were to realize by reason of thus originally becoming part of the enterprise and liable to the lender of necessary capital, is particularly established by the underwriting agreement in the words following:

"Each payment of forty-five thousand dollars ($45,000) to be made by the subscriber shall entitle the subscriber to receive fifty thousand dollars ($50,000) of the par value of preferred stock, and twenty-five thousand dollars ($25,000) of the par value of common stock of the American Silk Company."

Although the words "agree and undertake" were also used in the agreement, the use of the words "guaranty" and "guarantee" was quite inapt as describing the actual substantial relations; because, disassociated from the actual situation, it would suggest, of course, the rule strictissimi juris; but, after all, we must look beyond the words

to the real character of the obligation. The word or the letter does not necessarily describe the true relation. This idea is aptly illustrated by Judge Sanborn in Watson v. Merrill, 136 Fed. 359, 362, 69 C. C. A. 185, 188 (69 L. R. A. 719), in a bankruptcy case, where it was a question whether the claim was one for rents or damages; it making a difference in respect to the provable status of the claim whether it was rent or damages, and where the learned judge said:

"The application to it of the title of a claim for damages for a breach of the lease neither changes its nature, nor makes it more provable than it would have been if its real character had been described by its name."

So it is that the true relations of these defendants to the transaction in question must be ascertained by reference to the situation of the property and the real character of the enterprise. This is important, because a slight variance may relieve one who stands as a guarantor of the debts or obligations of another, but a slight variance does not always operate to relieve a principal who undertakes to stipulate for performance of his own primary obligations.

In interpreting such words as "agrees," "undertakings," "guarantees," "guaranteed," and "guaranty," used in the agreement in connection with the undertakings of the subscribers, with a view of ascertaining whether they were mere guarantors or, in substance and effect, principals, reference must necessarily be had to the general purposes of the enterprise, its real character and scope, to the situation of the property, and to the real interests of the different parties concerned in carrying the enterprise forward to success.

To all substantial intents and purposes this was an enterprise in which the subscribers assumed to make good their undertaking, which was to furnish capital which the enterprise necessarily required in its incipient stages; and, while in their agreement they in a certain way safeguarded themselves in respect to time loans, they also said, by virtue of the same agreement, and for the purpose of making the functions of the syndicate managers operative, that:

"Each subscriber hereby assents to all the terms of this agreement, and agrees to be bound by any action of the syndicate managers taken under this agreement, and agrees to perform all his undertakings hereunder upon call of the syndicate managers to the full extent set opposite his signature."

Thus in broad language the subscribers conferred upon the syndicate manager agency authority in respect to the general purpose sought—that of effectuating the success of the enterprise.

It is quite true that the general authority and the agreement to be bound by any action of the syndicate managers should be read with reasonable regard for the words of limitation contained in the same instrument; but the scope of authority and limitations thereon are to be ascertained under general rules of construction as contradistinguished from rules of strict construction, because there was a general purpose to carry forward a business proposition, through the instrumentality of syndicate managers, in which the subscribers were principals in a very substantial sense, and in connection with which they were undertaking to make themselves directly liable to whoever should make a loan necessary to the success of the proposition; and

it is because they were thus promoting action in respect to an enter-prise in which they were primarily interested, and in which they were primarily associated with the promoters, and others, in carrying it forward, that the obligation should be regarded as primary obligation governed by substantive rules of right, rather than as secondary obligation from which they may be relieved under rules of strict construction, or technical rules of right.

It is doubtless true, under such a situation as the one involved here, that action of the agents or the syndicate managers might be so far outside the authority and the purpose, especially where the lender had notice of the purpose of the enterprise and the limitations upon the authority of the agent, as to discharge the obligation altogether upon the ground that the departure was so complete as to operate in substantial derogation and fraud of the rights of the subscribers. But here the agreement necessarily contemplated certain details through syndicate manager instrumentality. The details of the loan were necessarily to be arranged by the syndicate managers; as, for instance, the agreement in no sense contemplated a note from the subscribers for the loan. The Bennett Company and the syndicate managers were in a broad sense agents of the subscribers, and in a very substantial sense they were principals with them—agents in a way in respect to the loan, and perhaps other phases, and jointly interested as principals in respect to the general purpose and scope of the enterprise, and sustaining such relations to the transactions, so far as they acted within the general purpose and scope, as would bind the subscribers in respect to the loan contemplated; but, in dealing with the Knickerbocker Trust Company, and so far as they acted in their own behalf in negotiating the loan, upon their own note, for the benefit of the subscribers and the general enterprise, and so far as they exceeded their authority under the terms of the written agreement, it would be a matter of adjustment between the Knickerbocker Company, the Bennett Company, and the syndicate managers. This is so because the original agreement which contemplated a loan and which created syndicate managers for the purpose, among other things, of negotiating a loan, in order to enable the vendors to realize upon the deferred stock payments of the subscribers, further provided that the subscription agreements of the subscribers should be delivered to the lender in pledge, etc.

The record shows that the subscription agreements, together with the stock, were deposited with the Knickerbocker Trust Company in connection with the loan transaction. It would thus result that they had full notice of all the limitations upon the authority of the Bennett Company and the syndicate managers.

In view of the whole situation, we think it entirely reasonable to say that the terms of the note create no rights in behalf of the trust company, or the lender, which could operate in any substantial way upon the rights of the subscribers in respect to time and interest and commissions, because the trust company, having notice of the limitations in this respect. would be charged with notice of the departures from the terms of the agreement, and, so far as those incidental and

technical departures are concerned, it is a matter entirely between the Bennett Company, the syndicate managers, and the trust company.

The subscribers are not bound by the particular terms of the note, neither are they bound by it as a note showing a cause of action and ground of recovery against them by the Knickerbocker Company. The note is only important in the case as a piece of evidence tending to show a loan which, in a substantial way, answered to the loan originally contemplated and described in the agreement. These suits are not at all based upon the note. Apparently in loaning, there was no purpose on the part of the trust company to look to the subscribers as a party to the loan note as such, because the loan agreement between the Knickerbocker Company and the Bennett Company expressly recognizes the limitations in respect to the loan and the stock subscriber safeguards of the original agreement, and the transaction proceeded upon the idea that the Bennett Company was the borrower, and that the loan was to be for one year upon the securities contemplated by the original agreement, "together with the collateral note signed by the borrower in the customary form used by the trust company."

This seems to be a transaction in which the note of the Bennett Company was collateral to the actual loan and real security. But, however that may be, if the terms of the note, in respect to semiannual interest rather than annual, and in respect to the contingency of bankruptcy or general assignment, involved a departure from the terms of the original agreement, they in no way affected the rights of the subscribers, because the lender was chargeable with notice of all the terms of the agreement in respect to the liability of the subscribers, and knew the exact status of liability which the subscribers created in its behalf.

The note signed by the Bennett Company was a mere collateral incident of the loan and of the syndicate and Bennett Company agency. The act of executing the note with a semiannual interest and bankruptcy provision was an act quite likely beyond the letter of their authority, and would quite likely render them responsible, in a way, to the Knickerbocker Company; but we do not view it as an act in any way affecting the liability or the substantial rights of the stock subscribers. The note not only could not be set up by the Knickerbocker Company as a ground of recovery, but as the Knickerbocker Company knew not only the exact status of the liability of the subscribers, but the terms upon which the subscription agreements and the preferred and common stock could be pledged as security for the contemplated loan, the rights of the subscribers in respect to the collateral stock security could in no way be abridged or controlled by the terms of the note, and any possible questions as to the rights of the Knickerbocker Company as against the Bennett Company in respect to the bankruptcy provision in the note, or in respect to the semiannual interest provision, would relate to entirely immaterial issues so far as concerns the substantive rights of the stock subscribers under their subscription agreements which established the terms and conditions upon which the collateral security for the loan might be held.

Under the circumstances the note as a note, in and of itself, neither

creates the liability of the stock subscribers, nor limits nor enlarges their liability as created by the subscription agreements. The note neither controls the right of action under the agreements, nor the measure of damages based upon the right. The right is established by the agreement, and it runs direct from the subscribers as principals, in substance, to whoever should lend the necessary capital, and the lender's right of recovery is what the original agreement contemplates and declares, which is that:

"In the event that any such loan is made, each of the subscribers whose subscription is pledged as security therefor, for himself only and not for any or either of the others, hereby guarantees to the lender with whom this agreement shall be pledged and his or its assigns the payment of such a proportion of the principal and interest of said loan as the unpaid part of his subscription hereto shall bear to the aggregate amount remaining due upon all the subscriptions pledged as security for such loan; and each of the subscribers hereby agrees that the lender shall have the right to proceed against the subscribers severally at once upon default to recover the several sums hereby respectively guaranteed as aforesaid, until the full amount of the principal and interest of said loan, with costs, shall have been recovered by the lender, without recourse to any other party and without recourse to any collateral security being first had or required."

Under this agreement, running direct to the lender, the subscriber's liability is to pay his proportion of the actual loan, not to pay according to the terms of any collateral note given by the agent.

The lender, the plaintiff, in its declaration, refers to the date of the loan, and it is true that the date of the loan was the same as the date of the note; but, in no substantial or technical sense are these actions based upon the note, because the right upon which the declaration founds its cause of action is, after all, based upon the underwriting agreement, and, such being the foundation of the right, the recovery must have reference to it, and not to the note, which was incident to the loan, and which on its face may be little more than the measure of damages properly referable to the original undertaking; and it results, reasonably enough, that the recovery may be less than that claimed, and such as may be based upon the agreement, and such as the actual loan is shown to be, regardless of semiannual interest and commissions, items not contemplated by the agreement which established the liability.

The agreement of the stock subscriber was to pay his proportion of the actual loan, and it thus results, as stated, that the right of recovery is founded upon the agreement rather than upon the note, which, in a certain technical sense, may be said to be outside the agreement, and therefore beyond the authority of the agents. The right of recovery, created by the agreement, is in effect limited to the amount to become due under the agreement, and the right runs direct from the stock subscriber to the lender, and is not extended or affected, at all, by the unauthorized feature of the note given by the Bennett Company. The liability and the terms upon which the contemplated loan was to be made were both expressly described in the agreement which the lender holds as something establishing and limiting its rights.

If the note had been expressly declared upon as an instrument creating liability, which was something not done, other questions

might present themselves; but, as the declaration is based upon the original undertaking of the stock subscriber, the measure of recovery might be for a less sum than that stated in the note, which was only a piece of evidence, provided the stock subscribers' proportion of the principal of the actual loan and interest at 6 per cent. per annum is less than that indicated by the note, which contains a semiannual interest provision, and, as is claimed, certain commissions.

Thus, as is seen, the rights of the lender in respect to recovery are measured by the actual loan and interest at 6 per cent. per annum. rather than by the amount stated in the note, and the rights of the subscribers in respect to stock deposited as collateral security for the loan were fully protected by the terms of the agreement in respect to time, and it results, therefore, that the subscribers were in no way harmed by the unauthorized terms of the note given by the Bennett Company to the lender.

The declaration aptly sets out what the obligation of the subscriber was;. that of agreeing or guaranteeing "to the lender with whom his said agreement should so be pledged, as aforesaid, the payment of such a proportion of the principal and interest of said loan as the unpaid part of his subscription under his said pledged agreement should bear to the aggregate amount remaining due upon all the subscriptions so pledged as security for such loan." It is also set out that each subscriber agreed that the lender should have the right to proceed against the subscribers severally at once. It is also alleged that the Knickerbocker Trust Company, acting upon the faith of a certificate of the syndicate managers and such agreements, loaned to the H. W. Bennett Company, for the period of one year, the sum of $843,050, payable at the end of a year; that the loan was made in pursuance of the terms of the agreement dated April 11, 1907, and the sum sought in each case is each subscriber's unpaid part of his subscription, to be ascertained by calculations made as of April 11, 1907, upon the amount of $843,050, and such unpaid part is what the plaintiff claims it is entitled to recover in each case; and it is alleged that a demand has been made, and that payment has not been made.

Thus it is seen that the plaintiff not at all, either in a substantial or technical sense, based its declaration upon the note as an instrument establishing a right, but upon the supposed right of action created by the original underwriting agreement, alleging that the loan was made in reliance upon such agreement and in pursuance of its terms.

Even if the H. W. Bennett Company's collateral note to the trust company, which is in evidence, includes items or elements not contemplated by the subscription agreement, and elements and items which the subscribers did not agree to stand for, we see no reason why the note should be accepted as affecting at all the trust company's just right, in the absence of bad faith, to recover each stock subscriber's contractual unpaid part of the actual money loan in reliance upon the underwriting agreement, although the same may be less than what would result from a calculation made upon the note.

It is quite true that some of the reasonings in respect to the rules which govern the essential question of liability would not apply to

situations of strict guaranty where the obligation is relieved upon grounds of technical and slight departure, and might not perhaps apply to supposed controversies between the stock subscribers and their agents. But accepting the obligation of the stock subscribers as primary, in respect to a loan made in good faith for their benefit, and upon their agreement, we think general and substantial principles of right render technical and harmless departures, by their agents, inadmissible as a ground of defense in their behalf and against a meritorious loan.

The trust company in good faith, so far as the record shows, let its money go out for the use of the stock subscribers, who have received its benefits, and have in no way been injured by the acts of their agents in respect to details and technical departures from the letter of authority; and, having in no way suffered, the trust company should not suffer through an application of strict rules of construction in order to make the technical and harmless departure of the subscribers' own agents operate to defeat the restoration of a meritorious loan.

Instead of being guarantors for the indebtedness of another, the subscribers as principals, in substance, made the Bennett Company and the syndicate managers their agents to carry forward an enterprise with which they had embarked; and, especially so far as concerns money loans necessary to advance their own interests, it results that they are not entitled to invoke strict rules of variance, but are bound by such acts of their agents, at least so far as they are not expressly limited and so far as they operate in accordance with the general purposes and in respect to transactions necessary to accomplish the general result contemplated.

Judge Putnam, speaking for this court in Fullerton v. Bigelow, 177 Fed. 359, 362, 101 C. C. A. 445, 448, in respect to a trust which required that property should be purchased "at the lowest figure obtainable at public sale," said that the phraseology was so specific as to entitle the principal to have the bid at the lowest figure obtainable at a public sale, but, as an addendum substantially changed the nature and the characteristics of the requirement in respect to public sale as the test of authority, that the remaining obligation was to proceed in a prudent manner to secure an arrangement such as might ordinarily have been accomplished.

It has been said that the ultra vires doctrine, as a strict rule against contracts, is generally looked upon with disfavor by the courts of this country; but it does not seem necessary to invoke any such extreme view in respect to these cases, because the situation here is one where the general scheme was intrusted to syndicate managers; and, in the event of success, the principals would reap certain pecuniary advantages; and the pecuniary advantages were dependent upon the success of the enterprise in which they had embarked; and we think the general authority of the syndicate managers and the Bennett Company was such that it was within the reasonable and necessary scope of their power to negotiate a loan accompanied with collateral upon the express one year's time stipulated, and that it was reasonable for

the agents in their own right though not within their express authority, to give their own note with a bankruptcy contingency, because, while the note was not the foundation of the loan, it was a necessary incident as between the syndicate managers, the Bennett Company, and the lender, and it was not unreasonable because it was a contingency which in no way would operate to abridge the rights of the stock subscribers.

The Bennett Company and the syndicate managers had their own interests to advance in connection with the enterprise, as well as the interests of the stock subscribers, and much depended upon negotiating the necessary loan and capitalizing the enterprise, and doubtless they might well enough, in their own right, incur personal liability as to necessary incidental matters, and in doing this, so far as the particular departures disclosed here are concerned, the status of right between the stock subscribers and the lender under the underwriting agreement was in no way changed.

We do not conceive it to be at all necessary or material to consider whether these departures from what might perhaps be called the strict letter of authority would operate to relieve the liability of a guarantor; because, as we have already said, the relationship of these defendants to the loan was not that of guarantors of the debt of another, but in substance that of parties who had guaranteed as principals to see that their own undertakings are carried out; and, if their agents or instrumentalities varied a little in respect to things not of harmful substance, they are not relieved.

The authorities cited by the defendants in error to sustain the proposition of fatal variance between the authority to negotiate a loan and the terms of the loan actually negotiated, with few exceptions, if any, relate to situations in which the guarantor or suretyship obligation was collateral and secondary to the debt or undertakings of others in respect to their own affairs, where the rules strictissimi juris apply, and have very little, if any, pertinent bearing upon questions of primary and original obligation like that which exists on the part of the stock subscribers in the cases at bar.

Without going very far into the question of distinguishing the nature of the obligation in the cases relied upon by the defendants in error, from the nature of the obligation existing in the cases under consideration, we will refer to a few of them.

The Peru Plow Company Case (Peru Plow & Wheel Co. v. Ward, Kan. App. 6, 41 Pac. 64), which is relied upon by the defendant as a case almost exactly in point to the one at bar, was, in fact, a case of strict surety where the party sought to be held made his agreement in respect to the debt and business of another; and in Page v. Krekey, 137 N. Y. 307, 33 N. E. 311, 21 L. R. A. 409, 33 Am. St. Rep. 731, though the facts are not very clearly stated, it would seem that the guarantor was not in any broad and substantial sense the principal. Flynn, Executor, v. Mudd & Hughes, 27 Ill. 323, was a case about a negotiable promissory note, in which the surety was in no sense the principal debtor; and in Foederer v. Moors, 91 Fed. 476, 33 C. C. A. 641, the parties sought to be charged were not

principals in the sense of having created original liability. In Miller v. Stewart, 9 Wheat. 681, 6 L. Ed. 189, there was a contract of surety for the faithful performance of the duties of an officer, where, of course, the obligation was not original; and in Guardian Trust Company v. Peabody, with a divided court (122 App. Div. 648, 107 N. Y. Supp. 515), the undertaking was not original, in the sense of creating direct liability to a lender based upon the guarantors' unpaid balance of their own existing indebtedness, but a guaranty liability to be subsequently created by notes nominated in the agreement, and of a kind particularly described and required by the agreement, where the party, in whose favor the guaranty was made, participated in the act of deviation from the substantial and particular requirements of the guaranty. The case of Lynn Safe Deposit & Trust Company v. Andrews, 180 Mass. 527, 62 N. E. 1061, was one of strict guaranty of the debt of another under conditions which would make the liability of the guarantor secondary and one governed by strict rules of law; and Walrath v. Thompson, 6 Hill, 540, was a guaranty of the payment of a debt of another in which the guarantor was not interested as a primary party to the obligation.

We see no occasion to further pursue cases involving guaranties where the obligation is secondary, because if the obligation of the subscribers in the case at bar was primary they have no pertinent bearing.

As we view the obligation of the defendant subscribers as original, and in substance upon their own existing indebtedness or undertaking, and as running directly from themselves to the lender, rather than a guaranty of the agreements and undertakings of the Bennett Company, we do not perceive that there are any questions in respect to notice from the lender to the subscribers such as is required in situations of suretyship and guaranty liabilities with respect to negotiable notes of others, and perhaps in other situations of collateral and secondary liability.

After the trial of the cases under consideration had proceeded several days, upon both counts, upon motion, which the Circuit Court treated as in substance made, a verdict was directed for the defendants on the first count. The Circuit Court apparently viewed the situation and referred to it as one in which the Knickerbocker Company "meant to loan that money under the terms of the underwriting agreement," and as one not showing anything contradictory between the loan agreement and the note, but one in which inconsistency "lies between the loan agreement and the underwriting agreement," and accepting the strict rules of law, which govern in respect to guarantors and sureties where a lender seeks to hold them under "a conditional agreement to pay somebody else's debt," upon forcible observations which clearly indicate that the learned judge's sense of justice was strongly offended by the operation of strict rules upon the obligation in question, directed a verdict for the defendants on the first count, and the trial thereafter proceeded upon the second count alone.

As we hold that the liability of the stock subscribers was original, and a liability in respect to their own undertakings, and that so far

as variance exists between the loan agreement and the note on the one side, and the underwriting agreement upon the other, that it was a matter between the lender and the Bennett Company and the syndicate managers, in no way affecting the liability established by the underwriting agreement in which the obligation runs direct from the subscriber to the lender—and therefore a harmless variance so far as concerns the rights under the original undertaking—it results that the judgments below must be reversed.

In the defendant's brief filed in this court, the grounds of defense to the first count are formally set out as follows:

"(1) The defendants never guaranteed any specified loan, but agreed with the Bennett Company to guarantee a particular kind of loan to the Bennett Company if any such should be thereafter made, and that none such was made.

"(2) The condition of the offer of guarantee was that the loan should be for a year or more. The loan was in fact made for a year or less.

"(3) The agreements of the defendants were with the Bennett Company and were merely offers to guarantee which required acceptance by some lender, and notice of such acceptance, to complete any contract and establish any liability, and that there was neither acceptance of the offer as made, nor any notice of acceptance whatever, nor even attempt to notify."

Under the interpretation and construction given to the underwriting agreement, and under the view taken as to the principles and rules of law which govern the obligation of the subscribers, none of the grounds stated in the brief and nothing in the record discloses any defense to their liability; but it still remains that the answer sets up bad faith and conspiracy as a ground of defense.

It is true that after verdicts for the defendants had been directed upon the ground of variance, and after the trial had proceeded several days upon the second count, the question of the lender's bad faith was not understood to be longer an issue as against the Knickerbocker Company either under the first or the second count, and all questions of bad faith were withdrawn, as is shown by the following colloquy, which appears in the record:

"Plaintiff's Counsel: The Knickerbocker Trust Company is charged with being a party to a conspiracy.

"The Court: I don't understand that the Knickerbocker Trust Company is now charged with participation in fraud as an issue in this case; but, if counsel will be kind enough to say that is so, I don't think we need go any further.

"Defendant's Counsel: I think what we say is this: In view of the ruling of the court upon the first count, it is unnecessary for us, on the second count, to offer any evidence on that. I don't mean to say we have withdrawn what we stated. I don't understand that that allegation is legally involved upon the issue upon the second count.

"Plaintiff's Counsel: Then, I understand, there is no further claim, certainly, in this suit, at this time, that the Knickerbocker Trust Company was a party to any conspiracy?

"The Court: As the case now stands on the second count there is no such issue to be passed upon by the jury.

"Defendant's Counsel: I don't desire to be understood as retracting anything which I have charged in regard to the conspiracy. I don't understand that since the first count has dropped out that it is necessary for us to show any such thing as to the Knickerbocker Trust Company; the suit being now the suit of the Bennett and not of the Knickerbocker Trust Company.

"The Court. The issue of conspiracy, so far as the Knickerbocker Trust

Company is concerned, I don't understand the defendants now contend is an issue in this case.

"Plaintiff's Counsel: And the issue of any charge of fraud against the Knickerbocker Trust Company is not in issue at this time in this case. That is what they say.

"The Court: That is what I understand. I understand that as a fact it is not in issue in the present trial, which is proceeding solely under the second count."

Notwithstanding such withdrawal, as the rights of the parties under the first count were turned solely upon the ground of variance in the court below, and as the order directing the verdict was made at a stage of the trial before the defendants had closed their case, and as the withdrawal of the question of bad faith was under such qualifying conditions as to probably leave that question open to the defendants upon a subsequent trial under the first count, the situation, though the record as it now stands shows no defense, is not one which would warrant the direction of a general verdict for the plaintiff, and, while the judgments should be set aside, there should be leave for further proceedings in the Circuit Court not inconsistent with the theory of this opinion.

If the rights between the lender and the subscribers are finally established under the first count, upon a subsequent trial, in accordance with the theory of this opinion, the questions as to the former trial and verdicts upon the second count would become wholly immaterial, and we see no reason, upon that view, why all questions relating to the trial and the verdict upon that count might not be held in abeyance and unconsidered for the present at least.

If the obligation is primary, any trial upon the second count would be a mistrial and wholly immaterial, because no verdict based upon the kind of liability alleged in the second count could be made referable to and become the basis of a judgment against a liability which runs direct from the subscriber to the lender. So long, therefore, as our holding stands in respect to primary liability in these cases, no verdict for the defendant upon the second count could operate to defeat the plaintiff's primary right, and for that reason any subsequent trial upon that count, while the status of such liability remains, would be upon altogether immaterial and fictitious issues.

If the obligation is primary, as we have held, the only possible defense is fraud, with which the lender was tainted. In any trial upon such an issue the plaintiff would have as broad a scope in respect to questions of fraud as it could possibly have under the second count, and, if it should fail, it would have had one trial upon that issue, and it would therefore have no interest, and perhaps no right, to try the question over again under the second count; but if, upon a trial under the first count, the plaintiff should prevail upon the question of fact as to fraud, and fail upon the ground that as a matter of law and construction the liability was not primary, then it might become material to the plaintiff's rights to have a trial upon the second count.

Under the view which we hold as to the nature of the obligation, it would not be practical or consistent to try the first and second counts together, because the moment the trial judge should rule in

accordance with what we hold in respect to primary obligation, all questions under the second count would become immaterial, because in no way germane to that kind of liability.

If the defendants prevail in a trial of the issue of fraud under the first count, recourse to the verdict on the second count would not be required in order to establish their rights, and, if they should fail, a verdict upon the second count could not under any circumstance avail them as a defense to their primary liability. Thus under the view we take, as to the nature of the liability, it is quite inconceivable that the pending exceptions and the verdict in respect to the second count are at present material, or can become so, except in the event of the plaintiff's prevailing upon the issue of fraud in a trial upon the first count, and failing to establish its rights upon the ground that the liability of the subscribers was not primary, but that of guarantors. If this should result, the second count verdict would become material, and the plaintiff is therefore entitled to have pending exceptions in respect to that part of the trial considered and determined.

The exceptions taken in the course of the trial upon the second count have reference to the refusal of the court to instruct, and to its instructions; but the substantial prejudicial matter is the admission of improper evidence.

[2] At a very late stage of the trial it was determined that a large part of the evidence introduced to the jury was inadmissible, as far as the issue to be submitted to the jury was concerned, and the court undertook to withdraw it from the minds of the jury; and the question for us to determine is whether the withdrawal, under the particular circumstances of this case, must be accepted as being so far effective as to remove all prejudice and thereby render the trial a fair trial within the meaning of the law.

Much evidence was admitted, subject to exception, which, as we have said, was wholly immaterial; and the question is whether it can reasonably be accepted as harmless under the particular circumstances of the trial in question. So far as the evidence was supposed to have been prejudicial, it groups about the tenth paragraph of the defendants' answer, as follows:

"(10) That on or about the 1st day of December, 1906, in and about the city and state of New York, the plaintiff company, together with its then president, Charles T. Barney, and its then vice president or first vice president, Frederick L. Eldridge, together with Harry W. Bennett and one Matthew G. Collins (said Eldridge, Bennett, and Collins being the persons referred to in the agreement attached to plaintiff's declaration), for the purpose of making and obtaining for themselves secret and unlawful profits, and the obtaining of secret, unlawful, and fraudulent gains and advantages, conspired and arranged together for the formation and promotion of the American Silk Company, referred to in plaintiff's declaration; that said Barney was then the president of the Knickerbocker Trust Company, plaintiff; that said Eldridge was then its vice president, sometimes called its 'first vice president'; that said Harry W. Bennett was then carrying on business as a promoter under the name 'H. W. Bennett & Co.' with offices on Broad street in the city of New York; that said Collins was then interested as a stockholder and officer and otherwise in the York Silk Manufacturing Company (Pennsylvania corporation), and being the corporation of that name referred to in the agreement annexed as 'Exhibit A' in plaintiff's declaration; that said York Silk Manufacturing Company was at that time indebted to the said Knickerbocker Com-

pany, and had been so indebted on a demand note originally given in August, 1905, in the sum of $495,000; that said H. W. Bennett & Co., the partnership above mentioned, was at the time and had for a long time theretofore been heavily indebted to the said Knickerbocker Trust Company, plaintiff, on account of or in connection with other large promotion schemes for corporate enterprises, in which the said plaintiff company and said Bennett & Company had co-operated; and that said Knickerbocker Company was also, or had also recently theretofore been, mortgagee of the said York Silk Manufacturing Company under a mortgage or deed of trust for $500,000."

Other paragraphs in the answer relate to the details of the alleged fraudulent scheme referred to in the paragraph which we have quoted; and specifically to obtaining secret profits to be used for the advantage of the parties to the alleged conspiracy, including the Knickerbocker Trust Company; to the use of a certain alleged false prospectus; to an alleged fraudulent scheme through which Bennett should secure the subscriptions to the stock of the American Silk Company, which are the basis of the suits, and assign them to the Knickerbocker Trust Company at illegal rates of interest; and to an alleged purpose to form a sham corporation known as the H. W. Bennett Company for working out their dishonest intentions. The answer at great length describes the alleged fraudulent conspiracy between the parties, including the solicitors of the Knickerbocker Trust Company, as the active authority in the conspiracy and in directing and guiding all the details. The paragraph in respect to the solicitors in effect charges them with organizing the corporation without any honest intention of its being in good faith a corporation, or for any "purpose or object beyond the participation in the fraudulent plan and scheme herein set forth." By and large, the plaintiff corporation and its attorneys were pictured as being from the beginning in the conspiracy with Bennett, Collins, and Eldredge. The plaintiff corporation was charged with being a party to the conspiracy as a whole. The charges in this respect were very severe and of a prejudicial nature.

Under the severe characterizations of the allegations in respect to the misrepresentations of Bennett and Collins and Eldredge, and in respect to an alleged conspiracy, evidence was admitted as tending to show a step in the direction of conspiracy, upon the assumption that subsequent evidence would connect the Knickerbocker Trust Company with the conspiracy, and as having made the advances as a part of the program of the conspirators. Under the allegation of conspiracy it was doubtless legitimate for the court to admit the evidence, postponing final action in regard to it until a later stage of the trial; but, when the first count was withdrawn from the jury, the claim of conspiracy went with it, and from that time forward evidence of the character complained of should have been treated as altogether out of the case.

After the first count had been withdrawn, together with the allegation that the Knickerbocker Company was in a conspiracy as to the matters in question, and as the plaintiff in respect to the second count stood as an assignee of the rights of the Bennett Company under the underwriting agreement, the only issue, under that count, was whether Bennett, who controlled the subscriptions for stock, had obtained them by misrepresentations. Yet, notwithstanding the fact that the ex-

pressed views of the court were against it, the defendants insisted on introducing evidence on the issue of conspiracy.

The case was on trial from March 30th to April 17th. The ruling on the first count to which we have referred was very early in the trial; so early that, while only 40 printed pages of the record preceded it, 351 printed pages succeeded it. It is not proposed to deal specifically with the prejudicial effect of special instances of inadmissible evidence, but with the effect of the general whole under the circumstances of this particular trial. The record is permeated with prejudicial evidence objected to by the plaintiff, all tending to show close relations between the Knickerbocker Trust Company and the members of the syndicate which promoted the organization of the American Silk Company, of which Bennett, Collins, and Eldredge were members. The court again and again expressed its views that such testimony was not admissible, but concluded to admit it at the risk of the defendants, with a view of determining at the end of the trial whether or not he should strike it out. The defendants in substance admit this because they say:

"It is to be remembered that the answer set up the defenses, conspiracy and false representations.

"The evidence which the plaintiff now complains of was offered by the defendants in support of the charge of conspiracy. It is true that it was all rejected by the trial court at the close of the trial, but it must be apparent that when the several separate bits of this evidence were offered the trial court properly admitted them as being competent on the question of the conspiracy; that is, having some fair probative force and value in that direction.

"The court received the evidence of conspiracy de bene as appears in several places in the record."

The proposition that evidence of conspiracy might have been received by the trial court de bene, up to the time when the court ruled out the first count, affords no excuse for the persistent efforts by which it was brought before the jury after the first count was thus ruled out.

Among the expressions of the court as to this class of evidence is the following:

"I am going to allow defendant's counsel to put in pretty much everything they want, subject to the exceptions of plaintiff's counsel. That will protect the plaintiff, and I think we will save time."

This remark was made, as the record shows, in response to the plaintiff's strenuous objections.

Again:

"The Court: Yes. I do not believe that the evidence is material; but I have gone a great way in letting all this in, indicating to the jury that I might have occasion to rule it out later. I will admit it subject to your exception for the present, and the jury will bear in mind that I may have occasion to exclude a large part of this testimony from their consideration hereafter."

More positive expressions, however, are found in another part of the record, where the following colloquy is shown:

"The Court: When we come to the discussion of questions of law, the court may have some views.

"Plaintiff's Counsel: Yes, but in the meantime this great mass of testimony has got before this jury, and it is going to be very difficult, it seems to me,

for them, out of the enormous record, to pick out the small amount of testimony that really bears upon the actual issues of this case.

"The Court: I think there is much in your objection, and it may be that things will be let in which can't afterwards be excluded, and it will be so prejudicial as to deprive, practically deprive, the other side of any advantage they may get therefrom. But, at the same time, were I to undertake to consider each of these objections at the present time and rule upon them, it is clear the case would never end, and I think, on the whole, this is a safer proceeding. There are objections, and I don't desire to minimize their effect. I think, on the whole, this is the safer proceeding."

Single instances, or several instances, of wrongful admission, and a subsequent withdrawal of evidence, are often treated as harmless; but here there are many instances. They permeate the record; and while particular instances standing alone might be harmless, standing as a whole, as they did here, through the course of a long trial, they make such a mass of suggestion and evidence of intimacy between the plaintiff and its officers and Bennett that the situation must be accepted as necessarily and naturally imbuing the mind of the jury with hostile impressions quite impossible to eradicate. The plaintiff's position upon this phase of the case is stated as follows:

"Reversible error was committed by the learned trial court in permitting defendants' counsel to thrust before the jury a mass of evidence concerning the profits of Bennett and Collins, the subsequent history of the silk company, and of its constituent companies and Collins' part in their management, thus tending to discredit the plaintiff's assignor: and also in permitting defendants' counsel to prejudice the jury, directly, whether deliberately or not, against the Knickerbocker Trust Company by charges and insinuations of conspiracy sought to be drawn from immaterial evidence, all of which matters were in no way relevant to the issues upon the second count, and which charges and insinuations the defendants' counsel refused to retract before the jury."

The conclusion is irresistible that the mass of testimony shown by the record, which was wholly irrelevant after the court's ruling on the first count, must have prejudiced the jury beyond the possibility of cure through a general withdrawal.

It results that the judgments and the verdicts in all the cases should be set aside.

In each case the judgment will be:

The judgment of the Circuit Court is reversed; the verdict is set aside; the case is remanded to that court for further proceedings not inconsistent with the opinion passed down this day; and the plaintiff in error recovers its costs of appeal.